## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BERNARD HOWARD, individually,

    Plaintiff,                 Case No. 21-cv-12036

v.                            Hon. Mark A. Goldsmith

DALE COLLINS, in his individual capacity,
WILLIAM RICE, in his individual capacity,
REGINALD HARVEL, in his individual capacity,
STEVEN MYLES, in his individual capacity; and
MONICA CHILDS, in her individual capacity,

    Defendants.

| | |
|---|---|
| MUELLER LAW FIRM | CUMMINGS, McCLOREY, DAVIS |
| Wolfgang Mueller (P43728) | & ACHO, P.L.C. |
| *Attorney for Plaintiff* | Stanley Okoli (P73722) |
| 41850 W. Eleven Mile Rd., Ste. 101 | James R. Acho (P62175) |
| Novi, MI 48375 | Shane R. Nolan (P78008) |
| (248) 489-9653 | *Attorneys for Defendants* |
| wolf@muellerlaw.com | 17436 College Pkwy. |
| | Livonia, MI 48152 |
| | (734) 261-2400 |
| | sokoli@cmda-law.com |
| | jacho@cmda-law.com |
| | snolan@cmda-law.com |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    **NOW COME** Defendants, William Rice, Reginald Harvel, Steven Myles,

Monica Childs and Dale Collins (collectively "Defendants"), by and through their

counsel, CUMMINGS, MCCLOREY DAVIS & ACHO, P.L.C., and hereby move

for Summary Judgment on all of Plaintiff Bernard Howard's claims pursuant to Fed. R. Civ. P. 56(a). Defendants' Motion is supported by the accompanying Brief.

The undersigned counsel certifies that, as required by Local Rule 7.1, he conferred with Plaintiff's counsel regarding the relief sought by this Motion to no avail.

The undersigned counsel certifies that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). The brief currently exceeds the maximum length afforded by the local rules and the court rules, as will be the subject of a separate motion.

**WHEREFORE** Defendants pray that this Honorable Court grant their Motion for Summary Judgment, along with any other relief deemed warranted under the circumstances.

<div style="margin-left:auto">

Respectfully Submitted,

**CUMMINGS, MCCLOREY, DAVIS & ACHO**

By: /s/ *Shane R. Nolan*
    SHANE R. NOLAN (P78008)
    17436 College Parkway
    Livonia, MI  48152
    (734) 261-2400 / Fax: (734) 261-4510
    snolan@cmda-law.com

</div>

Dated: June 9, 2023                    *Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BERNARD HOWARD, individually,

    Plaintiff,                    Case No. 21-cv-12036

v.                                 Hon. Mark A. Goldsmith

DALE COLLINS, in his individual capacity,
WILLIAM RICE, in his individual capacity,
REGINALD HARVEL, in his individual capacity,
STEVEN MYLES, in his individual capacity; and
MONICA CHILDS, in her individual capacity,

    Defendants.

| | |
|---|---|
| MUELLER LAW FIRM | CUMMINGS, McCLOREY, DAVIS |
| Wolfgang Mueller (P43728) | & ACHO, P.L.C. |
| *Attorney for Plaintiff* | Stanley Okoli (P73722) |
| 41850 W. Eleven Mile Rd., Ste. 101 | James R. Acho (P62175) |
| Novi, MI 48375 | Shane R. Nolan (P78008) |
| (248) 489-9653 | *Attorneys for Defendants* |
| wolf@muellerlaw.com | 17436 College Pkwy. |
| | Livonia, MI 48152 |
| | (734) 261-2400 |
| | sokoli@cmda-law.com |
| | jacho@cmda-law.com |
| | snolan@cmda-law.com |

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................- 1 -

II.  STATEMENT OF FACTS .........................................................- 1 -

   A.  The Triple Homicide And Arrest And DPD's Investigation Thereof ..........- 1 -

   B.  Preliminary Examination.................................................- 6 -

   C.  *Walker* Hearings.........................................................- 9 -

   D.  Jury Trial, Convictions And Sentence ..................................- 12 -

   E.  Post-Conviction Appeals And Rulings ..................................- 16 -

   F.  Howard's Post-Judgment Admissions That He Did Provide A Confession Statement To Defendant Childs And That His Trial Testimony To The Contrary Was A Lie. ...................................................................- 19 -

   G.  Investigation And Recommendation By The Wayne County Conviction Integrity Unit / Stipulated Order Vacating Convictions. .................- 21 -

   H.  Plaintiff's Amended Complaint ..........................................- 22 -

III.   STANDARD OF REVIEW ....................................................- 23 -

IV.   LAW AND ARGUMENT ......................................................- 24 -

   A.  Juries Are Only Required To Consider "Genuine" Issues Of Material Fact In Light Of The Whole Record, And There Are No Genuine Issues Of Material Fact That Would Prevent Summary Judgment In Defendants' Favor. ....................- 24 -

      1.  There Is No Genuine Issue Of Material Fact That Howard's Confession Was Not Manufactured And Coerced. ........................................- 24 -

      2.  There Is No Genuine Issue Of Material Fact That Howard Was Literate At The Time Of His Confession. .......................................- 26 -

      3.  There Is No Genuine Issue Of Material Fact That McMullen's Allegedly Manufactured And Coerced Confession Was Not Used Against Howard At Trial, And Thus, Had No Impact On The Jury's Verdict Finding Howard Guilty. - 26 -

      4.  There Is No Genuine Issue Of Material Fact The Allegedly Fabricated Confessions By McMullen And Salisbury To Jailhouse "Snitches," Cowan and

Twilley, Had No Impact On Establishing Probable Cause For Howard's Arrest Or Binding Him Over For Trial On The Charges.........................................- 27 -

B.   The Doctrines Of Collateral Estoppel And Res Judicata Bar All Of Howard's Claims. ...................................................................................................- 29 -

C.   Howard Cannot Maintain His Federal and State Malicious Prosecution Claims. ...................................................................................................- 34 -

D.   Howard Has No Viable Claim For A *Brady* Violation. .............................- 37 -

1.   Howard Cannot Maintain A *Brady* Claim Premised On Defendants' Alleged Use Jailhouse "Snitches." ..............................................................- 38 -

2.   Howard Cannot Maintain A *Brady* Claim Premised On Howard's Allegedly Manufactured And Coerced Confession.......................................................- 39 -

E.   Plaintiff Has No Viable 42 U.S.C § 1988 Claim.......................................- 45 -

F.   Defendants Are Entitled To Qualified Immunity.......................................- 40 -

V.   CONCLUSION AND RELIEF REQUESTED ...........................................- 47 -

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adair v. State*, 470 Mich. 105, 680 N.W.2d 386 (2004) ..................................- 33 -

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) .........................................- 35 -

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................- 23 -

*Bd of Co Rd Comm'rs for Co of Eaton v Schultz*, 205 Mich. App. 371 (1994)..- 31 -

*Brooks v. Tennessee*, 626 F.3d 878 (6th Cir. 2010) ....................................- 37 -

*Carlton v. Pytell*, 986 F.2d 1421 (6th Cir. 1993)........................................- 32 -

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ..........................................- 23 -

*Dart v. Dart*, 460 Mich. 573, 597 N.W.2d 82 (1999) .................................- 34 -

*Dowell v. Lincoln Co, Mo*, 762 F.3d 770 (8th Cir. 2014)..............................- 43 -

*Eaton Co. Bd. of Co. Rd. Comm'rs v. Schultz*, 205 Mich. App. 371 (1994).......- 33 -

*Hall v. Wooten*, 506 F.2d 564 (6th Cir.1974) ............................................- 46 -

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty*., 542 U.S. 177 (2004) .- 38 -

*Holland v. Rivard*, 9 F. Supp. 3d 773, 787 (E.D. Mich. 2014) ...........................- 43 -

*Hubbard v. Bell*, 2009 W.L. 2905949 (E.D. Mich. September 8, 2009).............- 42 -

*In re Kramer*, 543 B.R. 551 (Bankr. E.D. Mich. 2015) .......................................- 30 -

*Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002).........................................- 37 -

*Johnson v. Moseley*, 790 F.3d 649 (6th Cir. 2015)..............................................- 34 -

*King v Munro*, 329 Mich. App 594 (2019) .........................................................- 31 -

*Knoblauch v. Kenyon*, 163 Mich. App. 712; 415 N.W.2d 286 (1987)..... - 32 -, - 33 -

*Ledbetter v. Edwards*, 35 F.3d 1062 (6th Cir. 1994) ......................................- 25 -

*LeFever v. Ferguson*, 645 F. App'x 438 (6th Cir. 2016) ....................................- 37 -

*Lichon v. Am. Universal Ins. Co*., 435 Mich. 408, 459 N.W.2d 288 (1990).......- 33 -

*Marshall v. Lonberger*, 459 U.S. 422 (1983)......................................................- 27 -

*Massiah v. United States*, 377 U.S. 201 (1964) ..............................................- 39 -

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986)....- 24 -

*Matthews v. City of Memphis*, No. 13-2195-JDT/CGC, 2014 WL 1022862 (W.D. Tenn. Mar. 14, 2014)...............................................................................- 46 -

*Miller v. Fenton*, 474 U.S. 104 (1985)...............................................................- 40 -

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir.2009)...............................- 47 -

*Monat v State Farm. Ins. Co.*, 469 Mich. 679 (2004)............................. - 31 -, - 32 -

*Monell v. Dep't of Social Svs. of City of New York*, 436 U.S. 658 (1978) ..........- 46 -

*Moor v. Cty. of Alameda*, 411 U.S. 693 (1973)................................................- 46 -

*Oregon v. Elstad*, 470 U.S. 298 (1985) ................................................- 43 -

*Otto v. Somers*, 332 F.2d 697 (6th Cir.1964) .......................................- 46 -

*Payton v. City of Detroit*, 211 Mich. App. 375 (1995)..........................- 35 -

*Pearson v. Callahan*, 555 U.S. 223 (2009) ...........................................- 47 -

*People v. Hubbard*, 2007 W.L. 601603 (Mich. Ct. App., February 27, 2007). ..- 42 -

*Robinson v. Mills*, 592 F.3d 730 (6th Cir.2010) ...................................- 37 -

*Saltmarshall v. Prime Healthcare Services-Garden City LLC*, 831 F. App'x 764
  (6th Cir. 2020).................................................................................- 35 -

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................................- 41 -

*Scott v. Harris*, 550 U.S. 372 (2007)..................................- 24 -, - 26 -, - 27 -, - 29 -

*See United States v. Diebold, Inc.,* 369 U.S. 654 (1962) ......................- 23 -

*Smith v. Patterson*, 430 Fed. App'x 438 (6th Cir. 2011)......................- 40 -

*Storey v. Meijer, Inc.,* 431 Mich. 368 (1988) ........................................- 30 -

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989) .............- 24 -

*Strickler v. Green*, 527 U.S. 263 (1999).................................................- 37 -

*TBCI, P.C. v. State Farm Mut. Auto. Ins. Co.*, 289 Mich. App. 39 (2010) .........- 33 -

*U.S. v. Binford*, 818 F.3d 261 (6th Cir. 2016) ......................................- 41 -

*U.S. v. Clark*, 928 F.2d 733 (6th Cir. 1991) ..........................................- 40 -

*U.S. v. Mullins*, 22 F.3d 1365 (6th Cir. 1994) ......................................- 40 -

*U.S. v. Nopphadon Ninaswat*, No. 22-20630, 2023 WL 3600753(E.D. Mich. May
  23, 2023) .........................................................................................- 43 -

*United States v. Campas*, 2014 WL 3887881 (D. Ariz., August 7, 2014) ..........- 43 -

*United States v. Craft*, 495 F.3d 259 (6th Cir. 2007) ...........................- 41 -

*United States v. Flowers*, 2005 W.L. 1799195 (D. Kan., June 17, 2005)...........- 43 -

*United States v. Ohayon*, 2012 W.L. 13070065 (D. N.M., September 19, 2012). - 42 -

*United States v. Twiddy*, 2007 W.L. 3256649 (D. Colo., November 2, 2007);...- 42 -

*Vogel v. Kalita*, 202 B.R. 889, 893 (Bankr. W.D. Mich.1996)...........................- 30 -

*Wilson v. Burton*, 2018 WL 6977608 (W.D. Mich. Oct. 9, 2018)............ - 38 -, - 39 -

*Winget v. JP Morgan Chase Bank*, N.A., 537 F.3d 565 (6th Cir. 2008) .............- 33 -

## Statutes

42 U.S.C § 1983 ...................................................................................- 46 -

42 U.S.C § 1988 ..................................................................... v, ix, - 45 -, - 46 -

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ..............................................- 43 -

**Rules**

Federal Rule of Evidence 804(b)(3) ...................................................- 25 -
MCR 6.502(G)(2)...............................................................................- 29 -

**Treatises**

Restatement Judgments (2d), § 85(2)(a)..............................................- 33 -

**Constitutional Provisions**

Fifth Amendment ........................................................... - 38 -, - 40 -, - 43 -
Fourth Amendment .........................................................................- 44 -
Sixth Amendment...........................................................................- 38 -

## ISSUES PRESENTED

I. **Is There Any Genuine Issue Of Material Fact Regarding Plaintiff's Claims For Purposes Of Summary Judgment, When The Court Is Not Required To Accept Any Party's Account Which Blatantly Contradicts The Record?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

II. **Does Plaintiff Have Any Viable Claims When The Issues He Presents In This Case Have All Been Previously Presented In Various Courts And Are Therefore Barred By The Doctrines Of Res Judicata And Collateral Esoppel?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

III. **Does Plaintiff Have A Viable Malicious Prosecution Claim?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

IV. **Does Plaintiff Have A Viable *Brady* Violation Claim?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

V. **Does Plaintiff Have A Viable Self-Incrimination Claim?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

VI. **Does Plaintiff Have A Viable Fabrication Of Evidence Claim?**

    Defendants Answer:     No
    Plaintiff Answers:     Yes

VII. **Does Plaintiff Have A Viable 42 U.S.C § 1988 Claim When The Statute Is Not A Source For Civil Rights Claims?**

Defendants Answer:           No
Plaintiff Answers:           Yes

**VIII.  Have Defendants Violated Any Of Plaintiff's Clearly Established Rights Such That They Are Not Qualified Immunity?**

Defendants Answer:           No
Plaintiff Answers:           Yes

{01815962-1 }X

## I.     INTRODUCTION

Plaintiff, Bernard Howard ("Howard"), brings this action for compensatory and punitive damages, pursuant to 42 U.S.C. §1983 and §1988, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, alleging that he was wrongfully convicted of a 1994 triple homicide due to actions taken by Defendants, William Rice, Reginal Harvel, Steven Myles, Monica Childs and Dale Collins (collectively "Defendants"), who, at the pertinent times hereto, were homicide officers for the Detroit Police Department ("DPD"). **Exhibit A**: Amended Complaint, **ECF No. 22**. For reasons explained below, Plaintiff's claims are untenable in several respects, and Defendants now move for summary judgment pursuant to FRCP 56(a).

## II.     STATEMENT OF FACTS

### A. The Triple Homicide, DPD's Investigation And Arrests

On July 16, 1994, around 1:00 a.m., three young adults – Marcus Averitte ("Averitte"), Reshay Winston ("Winston"), and John Thornton ("Thornton") (collectively "the victims") – were fatally shot in a drug-related shooting at 5223 Eastlawn in Detroit, Michigan. **Exhibit A**, ¶11. During DPD's investigation, witnesses placed Kenneth McMullen ("McMullen"), Ladon Salisbury ("Salisbury") and a third unidentified person at the scene of the crime near the time of the shootings. **Exhibit A**, ¶12. McMullen (19 years-old) and Salisbury (21 years-old)

were subsequently arrested. **Exhibit A**, ¶12.

There was no physical evidence or eyewitness linking Howard to the crime. **Exhibit A**, ¶36. DPD officers were initially led to Howard (18 years-old) because they were informed the shooters included someone known as "Snoop Dog" or "Snoop," and Howard had been known by Averitte, McMullen and "the whole neighborhood" by that nickname. **Exhibit A**, ¶13; **Exhibit B**: Howard Deposition Transcript, pp. 38-39, 190; **Exhibit C**: McMullen Deposition Transcript, p. 12. Howard knew both Averitte, who was a drug dealer and sold drugs out of the Eastlawn house, and McMullen, who sold drugs for Averitte. **Exhibit B**, pp. 34, 36-38.

On July 17, 1994, Howard presented to DPD headquarters and, after initialing and signing an advice of rights form, gave a statement to Officer R. Thomas at approximately 8:00 p.m. **Exhibit A**, ¶14; **Exhibit B**, p. 49-51; **Exhibit D**: Howard Constitutional Rights Form – 7/17/94; **Exhibit E**: Howard Statement – 7/17/94; **Exhibit F**: Howard Walker Hearing Transcript, p. 33-34; **Exhibit H**: Howard Interrogation Record – 7/17/94. Howard, in his signed handwritten statement, denied any involvement in the murders and told Ofc. Thomas that he was at his friend Jeemel "Duck" Spencer's house until 1:30 a.m. on July 16, 1994. **Exhibit E**. Howard was then released. **Exhibit A**, ¶14; **Exhibit F**, p. 33-35.

On July 18, 1994, McMullen was brought to DPD headquarters for questioning at approximately 8:00 a.m. **ECF No. 22**, ¶12. McMullen signed an advice of rights form at 11:45 a.m. and was thereafter questioned intermittently by Defendant Myles, the officer in charge (OIC) of DPD's investigation, for several hours, until approximately 1:30 a.m. on July 19, 1994. **Exhibit A**, ¶15; **Exhibit C**, pp. 21, 25; **Exhibit G**: McMullen Constitutional Rights Form – 7/18/94; **Exhibit L**: McMullen Walker Hearing, pp. 9, 27, 40. McMullen denied being at the Eastlawn residence at the time of the shootings or having knowledge of or involvement in the offenses. **Exhibit L**, pp. 12, 14. After that initial interview, McMullen was taken to DPD's 9th floor jail where he was held until further questioning. **Exhibit L**, pp. 28, 40, 42.

In the early afternoon on July 19, 1994, two other inmates in the DPD 9th floor lock-up, Oliver Cowan ("Cowan") and Joe Twilley ("Twilley'), gave statements to Ofc. Carrie Russell indicating that they spoke with McMullen while in lockup and that McMullen admitted to them that he was involved in a robbery turned shooting with two other individuals, "Val" and "Snoop Dog." **Exhibit A**, ¶s19-20; **Exhibit I**: Cowan Statement – 7/19/94; **Exhibit J**: Twilley Statement – 7/19/94.[1] Twilley

---

[1] Twilley would subsequently give another statement to police on July 22, 1994 indicating that he also had a conversation with "Val" (Salisbury) while in lock-up and that he (Salisbury) confessed to his involvement in the shootings, while also implicating "Ken" (McMullen) and "Snoop Dog" (Howard). **Exhibit R**: Joe Twilley Statement – 7/22/94.

would go on to testify at the preliminary examination and trial; Cowan did not testify at either.[2]

On July 19, 1994, at 4:40 p.m., McMullen was questioned again by Defendant Myles. **Exhibit L**, pp. 14, 44 McMullen initialed and signed another advice of rights form, and at approximately 10:50 p.m. provided a statement to Defendant Myles, which was memorialized in hand-written form (and not "pre-typed" as alleged by Howard). **Exhibit K**: McMullen Constitutional Rights Form – 7/19/94; **Exhibit L**, pp. 15-16, 33; **Exhibit M**: McMullen Statement – 7/19/94. McMullen, by his statement, identified Howard as "Snoop Dog" and admitted assisting Salisbury and Howard in the commission of the planned robbery. However, McMullen denied possessing a gun and claimed it was Salisbury and Howard who shot the victims. **Exhibit L**, p. 17-18; **Exhibit M**. McMullen was provided an opportunity to review his hand-written statement and he acknowledged as much by initialing and signing same. **Exhibit L**, pp. 19-20; **Exhibit M**.

On July 20, 1994, Howard was brought back into DPD headquarters for further questioning around 1:30 a.m. and was interviewed again by Defendant Myles. **Exhibit B**, p. 62; **Exhibit N**: Howard Constitutional Rights Form – 7/20/94. At 2:10 a.m., Howard read, signed and initialed an advice of rights form. **Exhibit B**,

---

[2] Upon information and belief, Cowan passed away in January 1995, before Howard's trial in March 1995.

pp. 62-63; **Exhibit N**. Howard denied any involvement in the shootings and never gave Myles a formal statement. **Exhibit A**, ¶21. **Exhibit B**, pp. 72-73.

Later that morning, on July 20, 1994, Howard met with Defendant Childs for further questioning. At 9:45 a.m., Howard signed and initialed yet another advice of rights form. **Exhibit O**: Howard Constitutional Rights Form – 7/20/94 at 9:45 a.m. Howard ultimately recanted his prior statement from July 17, 1994 and confessed to assisting McMullen and Salisbury in the robbery at 5223 Eastlawn. **Exhibit P**: Howard Statement – 7/20/94. However, Howard denied possessing any gun himself and claimed that it was McMullen and Salisbury who shot the victims. **Exhibit P**. Howard, in his statement, expressly acknowledged having been advised of and understanding his constitutional rights, denied having been verbally or physically abused by any member of DPD, and also denied having been promised any favorable treatment in exchange for his statement. **Exhibit P**. It is undisputed that each page of Howard's type-written statement, which is in question-and-answer format, is signed by Howard. **Exhibit B**, p. 73; **Exhibit P**. Moreover, at the end of the typed portion of the statement, Howard hand-wrote: "*I ran to Duck's house and went home Sunday morning 9:30 a.m.*" **Exhibit P**. Howard was subsequently arrested in connection with the shootings. **Exhibit A**, ¶26.

On July 20, 1994, DPD submitted an Investigator's Report/Request for Warrant to the Wayne County Prosecutor's Office, which was approved by Assistant

Prosecuting Attorney (APA) John Scavone the same day. **Exhibit A**, ¶s 29, 32;

**Exhibit Q**: DPD Investigator's Report/Request for Warrant. In pertinent part, the

Investigator's Report/Request for Warrant notes McMullen's and Howard's

respective confession statements; however, there is <u>no reference to the police</u>

<u>statements of jailhouse witnesses, Oliver Cowan and Joe Twilley</u>. **Exhibit Q**.

After the arrest warrant was signed by a 36th District Court Judge on July 22,

1994, McMullen, Salisbury and Howard were each charged with three counts of

first-degree murder, three counts of second-degree murder, three counts of armed

robbery, and felony firearm.[3]

### B. Preliminary Examination

A preliminary examination was held before the 36th District Court on August

16, 1994. **Exhibit S**: Preliminary Examination Transcript. Among the witnesses to

testify at the hearing were Defendant Childs, Joe Twilley and Defendant Myles.

Defendant Childs testified as to her interview of Howard and his confession

statement from July 20, 1994. **Exhibit S**, p. 20. Childs testified that Howard, prior

to questioning, had been twice advised of his rights, and that Howard ultimately

waived his rights and agreed to give Childs a statement. **Exhibit S**, p. 21-23, 25, 37,

39-40. Childs typed Howard's statement, which marked as an exhibit and read into

---

[3] The undersigned defense counsel has been unable to obtain a copy of the signed
arrest warrant. However, a copy of the trial court register of actions is attached hereto
as **Exhibit SS**.

the record. **Exhibit S**, pp. 28-29, 31-37. Childs testified that Howard was afforded the opportunity to read over his statement after it was typed and make any necessary changes. **Exhibit S**, p. 37. Howard added the handwritten sentence at the end and otherwise affirmed his statement was accurate by signing same. **Exhibit S**, p. 37.

Upon the motion by APA Paul Bruno, the District Court ultimately bound Howard over to Circuit Court for trial on all charges. **Exhibit S**, p. 89-90 Mr. Bruno was deposed and confirmed that he moved to bind Howard over because he believed there was probable cause for the charges against Howard. **Exhibit T**: Transcript of Deposition of APA Paul Bruno, pp. 68-69. Mr. Bruno also verified – and as is reflected in the preliminary examination transcript (**Exhibit S**) – that Howard was bound over prior to and irrespective of Joe Twilley's testimony, and that Twilley's testimony was only applicable to the other two defendants, McMullen and Salisbury. **Exhibit T**, p. 45.

After Howard's bind over, Twilley testified that in July 1994, he was an inmate in the DPD 9th floor jail. **Exhibit S**, pp. 123. He had been there for about eight (8) or nine (9) months and had trustee status, allowing him to move about the jail. **Exhibit S**, pp. 126, 133. Twilley explained that he had been transferred out of state prison to the DPD jail because he was scheduled to be a witness in a pending arson case. **Exhibit S**, p. 123-124, 137. Twilley, consistent with his police statements (**Exhibit J**; **Exhibit R**), testified that while in the DPD jail, he had conversations

with McMullen and Salisbury who admitted their involvement in the robbery and shootings and also implicated "Snoop Dog" (Howard). **Exhibit S**, pp. 125-132. Twilley reported his conversations with McMullen and Salisbury to the police. **Exhibit S**, p. 132. Twilley denied being promised anything by the police for his testimony. **Exhibit S**, p. 132. Twilley acknowledged that he had previously given statements to the police and had testified in three cases in which other inmates had confessed their involvement in crimes. **Exhibit S**, 133, 137. Twilley further testified that he had previously been convicted of second-degree murder and that he had recently been re-sentenced to time served, and thus, was no longer in prison at the time of the hearing.[4] **Exhibit S**, pp. 134-135, 137. Finally, Twilley denied that he had been planted in the DPD 9th floor jail to act as an agent "snitch" for DPD or that the police had fed him information regarding the case. **Exhibit S**, pp. 135-136.

---

[4] On July 27, 1994, Judge M. John Shamo of the Wayne County Recorder's Court held a suppressed hearing on Twilley's motion for relief from judgment relating to Twilley's prior sentence of 12-25 years imprisonment for a second-degree murder conviction. The hearing, in large part, focused on Twilley's cooperation with police and prosecutors. Defendant Collins appeared for the hearing and testified that Twilley, while in jail, had assisted the DPD homicide section and other divisions of DPD in obtaining confessions from other inmates. APA Rosemary Gordon, appearing for the hearing, approved Twilley's request for a sentence reduction and, in fact, noted praise of Twilley and support for his sentence reduction by APA Thomas Beadle who, with Twilley's assistance, had recently prosecuted an arson/homicide case. See **Exhibit OO**: Transcript of Twilley Motion for Relief from Judgment (In Camera Hearing) – 7/27/94. Twilley was resentenced two days later, on July 29, 1994, to time served and released. **Exhibit PP**: Transcript of Twilley Re-Sentencing – 7/29/94

Defendant Myles testified as to his interrogation of McMullen and his confession statement made on July 19, 1994, after McMullen signed the advice of rights form. [**Exhibit S**, pp. 141-143, 147, 152, 162] McMullen agreed to waive his rights and give a statement, which he also signed. The statement was admitted as an exhibit and read into the record. **Exhibit S**, pp. 152-162. Myles testified that McMullen was afforded food and beverage, and he denied making any threats or promises to McMullen. **Exhibit S**, pp. 148, 152.

### C. *Walker*[5] **Hearings**

Prior to trial, both McMullen and Howard move to suppress their respective police statements, and the trial court held *Walker* hearings to determine the voluntariness of those statements.

McMullen's *Walker* hearing was held on December 9, 1994 and testimony was taken from Defendant Myles and McMullen. **Exhibit L**. Myles, consistent with his testimony at the preliminary examination, testified as to the circumstances surrounding his interviews of McMullen on July 18th and 19th, 1994, and McMullen's eventual police statement, which (along with the advice of rights forms) was admitted into evidence. **Exhibit L**, pp. 7-36. Myles acknowledged that McMullen's interrogation on July 19, 1994 lasted several hours, until after midnight, but denied threatening McMullen in any fashion, and also denied promising

---

[5] *People v. Walker*, 374 Mich.331 (1965)

McMullen anything, including leniency on the charge or any related sentence. **Exhibit L**, pp. 9, 15, 30-31. Myles additionally denied that McMullen ever asked for an attorney. **Exhibit L**, pp. 11, 16-17, 32-33. Myles testified that McMullen was provided food and beverages. **Exhibit L**, pp. 29, 33-34.

McMullen testified that during questioning by Defendant Myles (and other officers), he was told that the police had enough evidence to convict him and that if he cooperated, he would only get 15 months in Wayne County Jail for robbery; otherwise, murder would result in a mandatory life sentence. **Exhibit L**, p. 38. According to McMullen, he never read but signed the statement prepared by Defendant Myles because Myles purportedly told him if he did, he could go home. **Exhibit L**, pp. 53, 60-61. McMullen testified that he requested but was never provided an attorney. **Exhibit L**, p. 41-42. McMullen admitted that he was not denied food or beverage – because he never asked for same, and he was afforded bathroom privileges. **Exhibit L**, p. 41.

Howard's *Walker* hearing was held on January 19, 1995. Howard's initial statement from July 17, 1994 as well as his confession statement from July 20, 1994 were admitted into evidence and testimony was obtained from Defendant Childs and Howard. **Exhibit F**.

Defendant Childs testified that on the morning of July 20, 1994, she arrived to work at 8:00 a.m., at which point Howard had already been in custody for about

eight hours and had previously signed an advice of rights form. **Exhibit F**, pp. 9-10, 12, 17. At 9:45 a.m., Childs advised Howard of his rights once again, and Howard affirmed his understanding of such by reading the rights aloud and initialing and signing the advice of rights form. [**Exhibit F**, pp. 10, 12, 14] Howard ultimately waived his rights and agreed to give a statement. [**Exhibit** F, pp. 15, 17-18] Howard's statement was reduced to writing, as typed by Childs in Howard's presence. **Exhibit** F, pp. 17-18, 29-30. Childs testified that the statement is comprised entirely of information given by Howard as it relates to the subject crime. **Exhibit** F, p. 21. Howard was then given the opportunity to review the typed statement and was asked if there was anything he wanted to add, redact or correct, and Howard added the hand-written sentence at the end. **Exhibit** F, pp. 22, 31. Childs denied having threatened Howard in any way or having made any promises to him. **Exhibit F**, p. 18.

Howard testified next. Per Howard, his initial statement from July 17, 1994 was truthful. **Exhibit F**, pp. 33-34. After he was picked up and taken back to DPD headquarters on July 20, 1994, around 1:30 a.m., Howard first met with Defendant Myles. **Exhibit F**, p. 36. Howard signed the advice of rights form. **Exhibit F**, p. 37. Per Howard, Myles kept coming in and out of the interview through the night, and Howard repeatedly denied knowledge of the shootings despite Myles purportedly being threatening and accusatory. **Exhibit F**, pp. 37-38. Howard then met with

Defendant Childs, who was nice to him. **Exhibit F**, p. 39. Childs asked questions about the crime and Howard, again, stated he knew nothing. **Exhibit F**, p. 40. According to Howard, Childs later came into the interview room with a pre-typed statement. **Exhibit F**, p. 40. Howard never read the statement and agreed to sign same after being told by Childs that his mother was waiting for him and that he could go home if he signed the statement. **Exhibit F**, pp. 40-42. Howard denied having added the hand-written sentence at the end of the statement (**Exhibit F**, p. 42) – which he has since admitted was a lie. **Exhibit B**, p. 89. Howard conceded that no one threatened him. **Exhibit F**, p. 42. Although Howard now claims in this lawsuit that he was "functionally illiterate" and "unable to read" at the time of his interrogations (**Exhibit A**, ¶24), both Howard and his defense attorney verified that Howard had completed the 9th grade and could read and write. **Exhibit F**, pp. 13, 39.

In the end, the Court determined that both McMullen's and Howard's confession statements were voluntarily given and, thus, admissible at trial.

### D. Jury Trial, Convictions And Sentence

A jury trial was held in the Wayne County Recorder's Court between March 6th – 30th, 1994. Howard and McMullen were tried before the same jury. Salisbury was tried before a separate jury.

Ofc. Myles and Ofc. Childs, consistent with their previous *Walker* hearing testimony, testified as to their respective interrogations of and confession statements

taken from McMullen and Howard implicating one in another in the shootings. McMullen's and Howard's statements were read into the record. **Exhibit U:** Trial Transcript Vol. VII pp. 11-47/Childs; Vol. VII pp. 47-102/Myles; Vol. VIII, pp. 136-155/Myles. Critically, at the conclusion of proofs, <u>the jury was instructed that the statements of McMullen and Howard were admitted only against the individual making the statement, and thus, could not be used against one another</u>. **Exhibit U**, Vol. XII, pp. 39-40.

Joe Twilley, consistent with his testimony at the preliminary examination, testified that in July 1994 he was incarcerated in the DPD 9th floor jail when he spoke to McMullen and Salisbury, who both admitted their involvement in the robbery-turned-shootings at the Eastlawn residence, while also implicating "Snoop dog" (Howard). The jury was made aware that Twilley had spent several months in the DPD jail where he was afforded "trustee status" and, thus, had the ability to move about the jail. The jury, largely during extensive cross-examination by defense counsel, was also made aware that Twilley had cooperated with police and had testified against fellow inmates in other homicide and arson cases; and that he, prior to trial, had received a sentencing reduction to time served on a second-degree murder conviction as a result of his cooperation with police and prosecutors. Twilley denied being fed information about the case by the police, and further denied

receiving any deals from the prosecutor's office in exchange for his testimony in this case. **Exhibit U**, Vol. VII, pp. 154-173; Vol. VIII, pp. 79-135.

Howard took the stand and testified in his own defense. As he did at the *Walker* hearing, Howard testified as to his interviews with Ofc. Myles and Ofc. Childs, and admitted signing his police statement, but claimed he was coerced into doing so and, further, that the events described in the statement, as pre-typed by Defendant Childs, were fabricated by Childs.[6] Howard denied any involvement in the murders and testified that he, around the time of the shootings, was playing cards with his friend Jameel Spencer (who also testified) and others at the house of Tyeisha Washington (who did not testify). **Exhibit U**, Vol. X, pp. 50-86.

McMullen also took the stand in his own defense and denied any involvement in the offenses, claiming that he was with his girlfriend at the time. McMullen testified as to his interviews with police, which he described as coercive, and admitted giving a statement to the police but, like Howard, claimed the events described in his statements did not come from him and were, instead, manufactured by police. **Exhibit U**, Vol. IX, pp. 154-183; Vol. X, pp. 21-32.

---

[6] Notably, as discussed further below, Howard has since admitted that he did make the statement at issue, after purportedly being presented with McMullen's statement implicating Howard in the shooting, and further that he lied at trial when he testified that the statement was not his. See **Exhibit QQ**: Howard message to Claudia Whitman; see also **Exhibit RR**: Howard affidavit - 5/22/13.

On rebuttal, Defendant Rice denied talking to McMullen or making any promises to him. **Exhibit U**, Vol. X, pp. 89-96. Defendant Childs denied threatening Howard or promising him anything. **Exhibit U**, Vol. X, pp. 96-102. Defendant Myles also denied threatening McMullen in any fashion. **Exhibit U**, Vol. X, pp. 105-108.[7]

During closing arguments, defense counsel stressed that Twilley, given his history, lacked credibility and that his testimony should be discounted. **Exhibit U**, Vol. XI. More specifically, McMullen's attorney remarked that Twilley "is a professional witness" who "will say whatever the police want him to say" and "he's rewarded by doing that." **Exhibit U**, Vol. XI, p. 49, 55.

On March 30, 1995, after the close of proofs, the jury for Howard (and McMullen) convicted him of all charges. **Exhibit A**, ¶s 48, 55. The trial court vacated the second-degree murder convictions and, on May 12, 1995, sentenced Howard to concurrent terms of life imprisonment without parole on the first-degree felony murder convictions and armed robbery convictions, and a consecutive term of two years imprisonment on the felony firearm conviction.[8] **Exhibit A**, ¶s 49, 57; **Exhibit V**: Judgment of Sentence – 5/12/95.

---

[7] Defendant Harvel and Defendant Collins did not testify at the trial.
[8] McMullen and Salisbury were also convicted and remain in prison without the possibility of parole. Howard acknowledged at his deposition that the collective evidence presented at trial supported the juries' findings of guilt as to McMullen and Salisbury. **Exhibit B**, pp. 111, 114.

### E. Post-Conviction Appeals and Rulings

Howard filed an appeal of right with the Michigan Court of Appeals raising various claims which, among other things, concerned the admission of McMullen's and Salisbury's statements to fellow inmate, Joe Twilley, as well as the admission of Howard's own confession statement, which he asserted was coerced. Howard's appeal and the People's response thereto are attached hereto as **Exhibit W** and **Exhibit X**, respectively. The Michigan Court of Appeals vacated Howard's armed robbery convictions and sentences on double jeopardy grounds but denied relief on the other claims and affirmed his first-degree felony murder and felony firearm convictions and sentences. **Exhibit Y**: *People v. Howard*, 456 Mich. 936 (Feb. 24, 1998).

Howard subsequently filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. **Exhibit Z**: *People v. Howard*, 456 Mich. 936 (Feb. 24,1998).

Howard subsequently filed a motion for evidentiary hearing with the trial court asserting, in pertinent part, that he should be afforded a new trial based upon newly-discovered evidence – specifically, a July-August 1998 letter (signed on April 2, 2001) and related November 28, 2012 affidavit from prisoner Jonathan Hewitt-El indicating that he and Joe Twilley served as police informants and witnesses in several cases, were fed case information and/or told what to say by the police, and

were granted special privileges for their cooperation. **Exhibit AA**: Motion for Evidentiary Hearing – 5/29/13; see also **Exhibit BB**: July-August 1998 letter by Hewitt-El; **Exhibit CC**: Motion for Leave to File Amended Motion for Relief from Judgment Based On Newly Discovered Evidence – 7/28/13. The trial court denied Howard's motion finding that he had raised the claim that Joe Twilley was a police informant on direct appeal and was denied relief, thereby precluding further review; that the affidavit of Jonathan Hewitt-El was not newly-discovered evidence, was of doubtful credibility, and was not of such a nature to render a different result on re-trial given the other evidence of guilt presented at trial. **Exhibit EE**: Trial Court Opinion - *People v Howard*, No. 94-08763-03 (Wayne County Cir. Ct. March 27, 2014).

Howard then moved for reconsideration in which he attached a February 8, 1995 memorandum and related June 11, 2013 affidavit from former Wayne County Deputy Chief Assistant Prosecutor Robert Agacinski ("Agacinski") stating that certain defense attorneys had reported that certain prisoners, including Joe Twilley, were intentionally used as police informants and, unbeknownst to prosecutors, afforded special privileges for their cooperation, and further that Defendants Collins and Rice pushed to have Twilley re-sentenced and went directly to Judge Shamo when prosecutors would not agree. See **Exhibit FF**: Agacisnki 2/8/95 memorandum and 6/11/13 affidavit; **Exhibit KK**: *Howard v. Brewer*, 2017 WL 783494, Case No.

2:15-cv-13765 (E.D. Mich., March 1, 2017). The trial court denied reconsideration on June 2, 2014. See **Exhibit SS**: Register of Actions – Wayne County Case No. 94-008763-FC**.** Subsequent applications for leave to appeal with the Michigan Court of Appeals and Michigan Supreme Court were denied. See **Exhibit FF**: Howard Application for Leave to Appeal – 6/26/14; **Exhibit GG**: Howard Motion to Remand for Evidentiary Hearing – 6/26/14; **Exhibit HH**: MCOA Order - *People v Howard*, No. 322503 (Mich. Ct. App. Nov. 7, 2014); **Exhibit II**: MSC Order - *People v. Howard*, 498 Mich. 871 (Sept. 9, 2015).

Later, on September 29, 2015, Howard filed a federal habeas petition in this District Court wherein he asserted several claims as grounds for relief, including alleged newly-discovered evidence of a *Brady*[9] violation – specifically, evidence that Joe Twilley was a police informant who testified falsely about his status and re-sentencing. **Exhibit JJ**: Howard Petition for Writ – 9/29/15. As to the alleged *Brady* violation surrounding Twilley, Howard, once again, relied on Agacinski's memorandum and related affidavit (**Exhibit DD**) as well as Hewitt-El's letter and related affidavit (**Exhibit BB**). This Court ultimately ruled that Howard's *Brady* claim – even if timely – lacked merit, would not have resulted in a different outcome at trial, and did not warrant habeas relief:

> In this case, [Howard] fails to show that Joe Twilley's testimony about the co-defendants' admissions to him were actually false. Neither the

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).

Agacinski memo nor the Hewitt-El letters establish that Twilley testified falsely about those matters. Rather they indicate that <u>Twilley may have minimized the extent of his police cooperation and/or lied about the benefits that he received from such cooperation when he testified at trial. While such information, if admissible, would have served as impeachment material, it would not have affected the outcome of trial. As noted, Twilley's credibility was contested at trial.</u> More importantly, given the admission of petitioner's police statement in which he confessed to participating in the crimes with the co-defendants and given the other evidence linking his co-defendants to the crimes, there is no reasonable likelihood that the alleged false testimony would have affected the judgment of the jury. [**Exhibit KK** (emphasis added.)]

The Sixth Circuit Court of Appeals subsequently denied Howard's application for a certificate of appealability and affirmed this Court's judgment denying his writ of habeas corpus. **Exhibit LL**: *Howard v. Burt*, 2017 WL 3425900, Case No. 17-1285 (6th Cir., August 9, 2017).

### F. Howard's Post-Judgment Admissions That He Did Provide A Confession Statement To Defendant Childs And That His Trial Testimony To The Contrary Was A Lie.

Notably, although Howard testified at both his *Walker* hearing and trial that Defendant Childs manufactured the pre-typed statement which he signed without reading, Howard has since admitted in email correspondence to Claudia Whitman, the Director of the National Capital Crime Assistance Network, that he did indeed make the statement at issue, after purportedly being presented with a copy of McMullen's statement implicating Howard in the shooting. For example, see **Exhibit QQ**: Howard message to Claudia Whitman (stating "the only reason *I was*

*able to make a statement* was because monica childs showed me a confession from kenneth mcmullen implicating me in this crime I got so afraid that *i tried to imitate what mcmullen said*[.]")(emphasis added). Moreover, when confronted with the foregoing correspondence with Whitman at his deposition, Howard conceded, once again, that he provided the confession statement to Defendant Childs:

> 9   Q.    Okay.  But you did provide her the statement, did you
> 10      not?
> **11   A.    Yes, sir.**
> 12   Q.    So yes?
> **13   A.    I provided that statement.**

**Exhibit B**, p. 79.

> 6   Q.    So going back to your correspondence with Ms. Whitman
> 7      on November 16th, 2017, you are in fact telling her
> 8      that as a result of having read McMullen's confession
> 9      you did provide a statement, correct?
> **10   A.    Yes, sir.**
> 11   Q.    All right.
> **12   A.    That's what they say.**
> 13   Q.    That's what it says.  Those are your words?
> **14   A.    Yes, sir.**

**Exhibit B**, p. 80.

Similarly, in his own affidavit from May 22, 2013, Howard admits that he lied at trial when he testified that he signed a confession statement that was not his:

```
I was afarid to admit that i was scare into confessing to a crime
that I did not commit I had never been under that kind of press
ure, and I was afraid to admit that I lied because my mother
and family was there, and I did not want to admit to this in
front of the jury I was terrified.
```

**Exhibit RR**: Howard affidavit.

### G. Investigation And Recommendation By The Wayne County Conviction Integrity Unit / Stipulated Order Vacating Convictions.

Following years of unsuccessful appeals, the Wayne County Conviction Integrity Unit ("CIU"), an investigative arm of the WCPO, decided to take on Howard's case and, after completion of its investigation, recommended that Howard's convictions be vacated. **Exhibit A**, ¶s 50, 58. The CIU, in pertinent part, determined: (1) that Joe Twilley's testimony implicating Howard "no longer satisfies MRE 804(b)(3)(B)'s requirement that the evidence be 'supported by corroborating circumstances that clearly indicate its trustworthiness' under the law;" (2) that Howard's confession "conflicts with other evidence about the crime regarding who shot the victims, and the day the killings took place"; and (3) that no physical evidence connected Howard to the crime scene. See **Exhibit MM**: WCPO CIU Press Release – 12/18/20. Prosecutor Worthy ultimately adopted the CIU's recommendation, and on December 17, 2020, the WCPO stipulated to an Order vacating Howard's convictions and sentences and dismissing the charges against him with prejudice. **Exhibit A**, ¶60; **Exhibit NN**: Stipulated Order Vacating Convictions – 12/17/20.[10] This lawsuit followed.

---

[10] In August 2020, after the CIU had already commenced its investigation into Howard's case, defense counsel for Howard filed a Motion from Relief from Judgment, asking the trial court to set aside Howard's convictions pursuant to MCR

### H. Plaintiff's Amended Complaint

Howard, in his Amended Complaint, alleges that Defendants, in violation of his constitutional rights under the Fourth, Fifth and Fourteenth Amendments, committed *Brady* violations (Counts I and II), fabricated evidence (Counts IV and VI), caused Howard, through coercion and false evidence, to incriminate himself (Count VI), and maliciously prosecuted Howard for a crime that he did not commit (Counts III and VII). See **Exhibit A**. Howard's claims are premised on allegations that Defendants, individually and/or collectively: (1) fabricated and coerced McMullen's confession statement (which implicated Howard in the shootings); (2) fabricated and coerced Howard's confession statement; (3) utilized fabricated confessions by McMullen and Salisbury (which implicated Howard in the crimes) to jailhouse "snitches," Oliver Cowan and Joe Twilley; and (4) failed to disclose, either to the prosecutor or defense counsel, that Twilley, as part of an alleged "jailhouse snitch program," and in exchange for special privileges, served as an "agent" and "listening post" on behalf of DPD homicide personnel to elicit confessions or incriminating statements from other inmates and help secure convictions. See **Exhibit A**. As explained below, each of Howard's claims lack merit and should be dismissed.

---

6.500 *et seq*. **Exhibit TT**; see also **Exhibit UU**: Transcript of 12/17/20 Motion Hearing.

## III.   STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses ..." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324 (1986). Fed. R. Civ. P. 56(c) provides that a motion for a summary judgment should be granted when "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The movant bears the burden of proving the lack of a genuine issue of a material fact. *Id.*

The Court must examine all facts in the light that is most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984). It is the ultimate responsibility of the Court to determine if any genuine disputes of fact exist. *Anderson,* 477 U.S. at 250. If the non-moving party's claim would fail under the law, even after assuming the facts are as the non-moving party posits them to be, a summary judgment must be entered. *Celotex Corp.,* 477 U.S. at 322. More than a mere scintilla of supporting evidence is required to defeat a meritorious motion for summary judgment. *See Anderson,* 477 U.S. at 252 (quoted in *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th

Cir.1989)). Evidence must be more than "merely colorable" to withstand the entry of a summary judgment. *Anderson,* 477 U.S. at 249–50 (citations omitted).

## IV.   LAW AND ARGUMENT

### A. Juries Are Only Required To Consider "Genuine" Issues Of Material Fact In Light Of The Whole Record, And There Are No Genuine Issues Of Material Fact That Would Prevent Summary Judgment In Defendants' Favor.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372 (2007) citing Fed. R. Civ. P. 56(c). A distinguishing characteristic of the instant case is the extensive record which exists of the underlying facts. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–587 (1986). As the U.S. Supreme Court has held:

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment*." *Scott*, 550 U.S. at 380 (emphasis added).

### 1. There Is No Genuine Issue Of Material Fact That Howard's Confession Was Not Manufactured And Coerced.

Howard's claim of a manufactured and coerced confession is blatantly contradicted by the record and should not be accepted by this Honorable Court. By his own admission, he was advised of his rights during his interviews with DPD homicide officers more than once. **Exhibit F**, p. 37. While he testified that Defendant Myles initially threatened him, his confession was made to Defendant Childs. He testified of his interaction with Defendant Childs and that she was "nice" to him. **Exhibit F**, p. 39. Hence, he was not under threat when he gave his confession. Further, Howard testified that although he knew he was being held for a triple murder, he nevertheless signed a statement handed to him by Defendant Childs without reading it, as is incredible. **Exhibit** F, p. 41.

Moreover, years after his convictions, Howard wrote Claudia Whitman admitting that he had, in fact, made the confession, purportedly as a result of his apprehension after seeing McMullen's signed statement.[11] **Exhibit B**, pp. 79-80; **Exhibit QQ**. This confirms that the confession was, in fact, Howard's statement, despite his previous contentions to the contrary. Howard's correspondence with Whitman serves as a statement against party interest under Fed R. Evid. 804(b)(3), which is an exception to the hearsay rules.

---

[11] Even assuming Howard was shown a copy of McMullen's statement, such conduct by a police officer is not illegal and does not, by itself, render an otherwise voluntary confession inadmissible. See *Frazier v. Cupp*, 394. U.S. 731, 737-739 (1969); *Ledbetter v. Edwards*, 35 F.3d 1062, 1068 (6th Cir. 1994).

The foregoing factors all indicate that there is no *genuine* of issue of material fact for trial on the issue of Howard's allegedly manufactured and coerced confession. Howard's contentions regarding a manufactured and coerced confession is blatantly contradicted by the record, so that no reasonable jury could believe it. *Scott,* 550 U.S. at 380.

### 2. There Is No Genuine Issue Of Material Fact That Howard Was Literate At The Time Of His Confession.

Like many of his claims, Howard's contention that he was "functionally illiterate" at the time he signed his confession is contradicted by the record. As an initial matter, a claim that he did not look at the confession before signing it necessarily contradicts a claim that he signed it because he was illiterate. Moreover, the *Walker* hearing dispenses with Howard's claim of illiteracy at the pertinent times, where, upon inquiry by the trial court as to Howard's literacy, both Howard and his defense attorney verified that Howard had completed the 9th grade and could read and write. **Exhibit** F, pp. 13, 16-19, 39. Consequently, Plaintiff's contention regarding his purported illiteracy at the time he gave his confession is blatantly contradicted by the record, so that no reasonable jury could believe it. *Scott,* 550 U.S. at 380.

### 3. There Is No Genuine Issue Of Material Fact That McMullen's Allegedly Manufactured And Coerced Confession Was Not Used Against Howard At Trial, And Thus, Had No Impact On The Jury's Verdict Finding Howard Guilty.

Howard's claim that Defendants caused McMullen to testify against him, through a manufactured and coerced confession, is also at odds with the record. At trial, the judge specifically gave the jury a limiting instruction that the confession statements of Howard and McMullen – both of whom testified – could not be cross-used against each another; only against the individual alleged to have made the statement. **Exhibit U**: Trial Transcript, Vol. XII, pp. 39-40. It is a "crucial assumption" and basic premise of our jury system that jurors are able to follow the trial court's instructions fully, *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983), and any argument that Howard's and McMullen's jury did not follow that clear instruction, or were otherwise confused, in arriving at their verdict would amount to nothing more than unfounded speculation and conjecture.

In light of the forgoing, Howard's contentions regarding the use of McMullen's confession against him at trial is blatantly contradicted by the record, so that no reasonable jury could believe it. *Id*. *Scott,* 550 U.S. at 380.

### 4. There Is No Genuine Issue Of Material Fact The Allegedly Fabricated Confessions By McMullen And Salisbury To Jailhouse "Snitches," Cowan and Twilley, Had No Impact On Establishing Probable Cause For Howard's Arrest Or Binding Him Over For Trial On The Charges.

Similarly, Howard's claim that there would not have been probable cause for his arrest or bind over but for the allegedly fabricated confessions by McMullen and Salisbury to jailhouse "snitches," Oliver Cowan and Joe Twilley, is contradicted by

the record. First, the police statements by Cowan and Twilley were not included in the Investigator's Report/Warrant Request (**Exhibit Q**), and hence, the WCPO, which approved the Warrant, and the magistrate judge, which signed the warrant, found probable cause to charge Howard with the murders irrespective of any statements by Cowan and Twilley.

Additionally, Cowan did not testify at the preliminary examination or trial, and his police statement was not otherwise admitted into evidence. And although Twilley testified at the preliminary examination, Howard had already been bound over for trial before Twilley testified, and consequently, Howard's bind over was not dependent on any testimony by Twilley. **Exhibit S**; **Exhibit T**, pp. 45, 68-69.

Finally, absent pure speculation and conjecture, Howard has presented no admissible proofs that Twilley's testimony, either at the preliminary examination or trial, was in fact false or fabricated by Defendants. Twilley's testimony of record is effectively unchallenged in that he has not been deposed or otherwise provided any statement that his testimony proffered in the underlying criminal proceedings was untrue, manufactured or elicited by any of these Defendants in connection with the alleged "snitch witness ring."

For these reasons, Howard's contention that there would not have been probable cause for his arrest or bind over but for the allegedly fabricated confessions by McMullen and Salisbury to jailhouse "snitches," Oliver Cowan and Joe Twilley

is blatantly contradicted by the record, so that no reasonable jury could believe it. *Id*. *Scott,* 550 U.S. at 380.

### B.  The Doctrines Of Collateral Estoppel And Res Judicata Bar All Of Howard's Claims.

Howard was not "exonerated" – i.e., he has not been not found to be innocent of the crimes he was accused of by a factfinder. Howard's Successive Motion for Relief from Judgment filed in August 2020 did not contend that he was innocent and, instead, merely stated that based on "newly discovered evidence" and "[p]ursuant to MCR 6.502(G)(2) there is a significant *possibility* that HOWARD is innocent of the crime." **Exhibit TT**, p. 4 (emphasis added). The Wayne County prosecutor in attendance at the hearing merely acquiesced in Howard's Motion by stipulating to an Order setting aside Howard's convictions and dismissing the charges against him with prejudice. **Exhibit NN**; **Exhibit UU**.

Prior to that, Howard had the full benefit of a consideration on the merits of his case, having filed no fewer than three appeals at every level of the Michigan court system and through habeas petitions in the Federal courts, wherein Howard made the same arguments he makes here, including: (1) that Howard signed a confession under duress by Defendants Myles and Childs; (2) that Defendant Childs promised Plaintiff that he would be able to go home with his mother if he signed the confession; (3) that McMullen's statement to Joe Twilley was inadmissible; and (4) that the police and prosecutors violated *Brady* by failing to disclose that Joe Twilley

(and other jailhouse "snitches") served as an "agent" informant for police, was told what to say, and was afforded special treatment to testify against Howard (and other inmates). See **Exhibit W**; **Exhibit AA**; **Exhibit CC**; **Exhibit FF**; **Exhibit GG**; **Exhibit J**. Howard's claims and arguments were decided on the merits and rejected at every turn. See **Exhibit Y**; **Exhibit Z**; **Exhibit EE**; **Exhibit HH**; **Exhibit II**; **Exhibit KK**; **Exhibit LL**.

Because the issues raised by Howard in this case have been previously raised and dispensed with in both federal and state court judicial systems, and he was not exonerated, he is barred from raising them in a new case as he has done here by the doctrines of collateral estoppel and res judicata.

> The primary difference between res judicata and collateral estoppel is that res judicata bars a second action on the same claim or cause of action including all matters that were raised or could have been raised in the first action, while collateral estoppel precludes relitigation of only such issues as were actually raised, litigated and determined in the first action and the decision of which were necessary to the judgment rendered.
>
> * * *
>
> Although they are distinct, the two doctrines serve largely the same purposes under Michigan law. Michigan courts have held that "[t]he doctrine of collateral estoppel must be applied so as to strike a balance between the need to eliminate repetition and needless litigation and the interest in affording litigants a full and fair adjudication of the issues involved in their claims. *In re Kramer*, 543 B.R. 551, 554 (Bankr. E.D. Mich. 2015) citing *Vogel v. Kalita*, 202 B.R. 889, 893 (Bankr. W.D. Mich.1996). *See also, Storey v. Meijer, Inc*., 431 Mich. 368, 372–73 (1988) (internal citations omitted).

"The doctrine of collateral estoppel precludes re-litigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding." *King v Munro*, 329 Mich. App 594, 599 (2019) (quotation marks omitted) (citation omitted). There are three elements required for collateral estoppel to apply: "(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *Monat v State Farm. Ins. Co.*, 469 Mich. 679, 682-684 (2004) (quotation marks omitted) (citation omitted). "To be necessarily determined in the first action, the issue must have been essential to the resulting judgment[.]" *Bd of Co Rd Comm'rs for Co of Eaton v Schultz*, 205 Mich. App. 371, 377 (1994).

All three criteria necessary for collateral estoppel are present in this case. Although Defendants – all of whom were police officers who played a role in Howard's underlying criminal investigation – were not strictly parties in the criminal trial, they were effectively in an adversarial position to Howard, and indirect privies to the prosecutors. ""[M]utuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action. In other words, '[t]he estoppel is mutual if the one

taking advantage of the earlier adjudication would have been bound by it, had it gone against him.'" *Monat*, 469 Mich. 679, 684-685 (2004) The all-important consideration was met here - i.e., Howard had a full and fair opportunity to litigate his case.

Moreover, Michigan courts have forgone the mutuality requirement in cases such as these, where a criminal case precedes a civil case. As explained by the Sixth Circuit Court of Appeals:

> . . . Michigan's courts have established several exceptions to the mutuality requirement. *One exception to the mutuality rule apparently exists when the first suit is a criminal matter and the second suit is a civil matter*. *Carlton v. Pytell*, 986 F.2d 1421 (6th Cir. 1993) citing *Knoblauch v. Kenyon*, 163 Mich. App. 712 (1987) (emphasis added).

In *Knoblauch, supra*, the plaintiff was charged with criminal sexual conduct. At trial, he was convicted of second-degree sexual assault. *Knoblauch*, 163 Mich. App. at 713-714. The plaintiff then discharged his criminal attorney and moved for a new trial claiming ineffective assistance of counsel. The trial court at first granted the plaintiff's request, but then upon motion by the prosecutor denied the plaintiff a new trial. The plaintiff appealed, to no avail. The plaintiff then brought suit against his attorney for legal malpractice, on the same grounds as the prior ineffective assistance of counsel claim. The trial court granted summary disposition for the defendant based on collateral estoppel. The Michigan Court of Appeals upheld the

ruling, citing the Restatement Judgments (Second) which was added to address a scenario where a civil case comes on the heels of a criminal case:

> With respect to issues determined in a criminal prosecution:
>
> "(2) A judgment in favor of the prosecuting authority is preclusive in favor of a third person in a civil action:
>
> "(a) Against the defendant in the criminal prosecution as stated in § 29 is civil. *Knoblauch*, 163 Mich. App. 712, 722, 415 N.W.2d 286, 290–91 (1987) citing Restatement Judgments (2d), § 85(2)(a), p. 294 (internal quotations omitted). *See also*, *Lichon v. Am. Universal Ins. Co*., 435 Mich. 408, 429, 459 N.W.2d 288, 298 (1990).

The related doctrine of res judicata is employed to forestall multiple suits litigating the same cause of action. In Michigan courts, the doctrine precludes a second, subsequent action when "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 470 Mich. 105, 121, 680 N.W.2d 386, 396 (2004) citing *Sewell v. Clean Cut Mgt., Inc*., 463 Mich. 569, 575 (2001). "The doctrine of res judicata is intended to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and encourage reliance on adjudication, that is, to foster the finality of litigation." *TBCI, P.C. v. State Farm Mut. Auto. Ins. Co*., 289 Mich. App. 39, 43 (2010) citing *Eaton Co. Bd. of Co. Rd. Comm'rs v. Schultz*, 205 Mich. App. 371, 375 (1994). Whether federal law or state law is applied here, the elements of res judicata remain the same. *See Winget v. JP Morgan Chase Bank*, N.A., 537 F.3d 565, 577-78 (6th Cir. 2008).

The elements of res judicata are met here, because: (1) the issue of whether Howard was innocent of his charges were resolved by the Michigan state courts on the merits; (2) the trial featured police officers, such as Defendants Childs, Myles and Rice, who may be considered privies of the prosecutors at trial; and (3) the matter was in fact resolved, albeit against Howard. As the Michigan Supreme Court has held: "This Court has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, *but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not*." *Dart v. Dart*, 460 Mich. 573, 586 (1999). Summary judgment would serve the purpose for both doctrines.

## C. Howard Cannot Maintain His Federal and State Malicious Prosecution Claims.

Howard alleges both a federal and state malicious prosecution claim. See **Exhibit A**, Counts III and VII. To satisfy the elements of such a claim, a plaintiff must establish four elements: (1) that the defendant initiated a criminal prosecution against him; (2) that there was no probable cause for the criminal prosecution; (3) that the plaintiff suffered a deprivation of his liberty; and (4) the criminal proceeding resolved in plaintiff's favor. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). Michigan's version of malicious prosecution mirrors the federal version, but additionally requires that a plaintiff establish that the defendant acted with malice. *Saltmarshall v. Prime Healthcare Services-Garden City LLC*, 831 F. App'x 764, 771

(6th Cir. 2020). "An officer acts with malice when he knowingly swears to false facts without which there is no probable cause." *Id.* citing *Payton v. City of Detroit*, 211 Mich. App. 375 (1995) (internal citations omitted).

Howard cannot meet the second and fourth elements of a malicious prosecution claim. There was probable cause for his arrest. He signed a confession admitting to his guilt (**Exhibit P**), despite his current attempts to discredit it. McMullen initially corroborated Howard's involvement by stating that it was Salisbury and Howard who shot the victims (**Exhibit M**), before he recanted his confession. Both McMullen and Salisbury, based on strong eye witness testimony and other proofs presented at trial, were convicted and remain in prison to this very day. "A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). The fact that the victims were killed with three different guns certainly is circumstantial evidence that there was more than one killer involved.

Jailhouse informant, Joe Twilley, also divulged that he overheard McMullen and Salisbury stating that "Snoop Dog" (aka, Howard) was involved in the murders. The jury was well-placed to gauge Twilley's credibility for themselves, especially on vigorous cross-examination by defense counsel which revealed the fact that Twilley had previously been convicted of second-degree murder, had spent several

months on the 9th floor lock up where he enjoyed special privileges, including "trustee" status, had assisted police and prosecutors by testifying in other homicide cases, and that Twilley, as a reward for his cooperation (and as approved by the WCPO) received a generous sentence reduction to time served and was released from prison. **Exhibit U**, Vol. VII, pp. 154-173; Vol. VIII, pp. 99-101, 114, 116-117, 120-121, 123-125, 136-138.

Howard also cannot meet the fourth prong because the criminal proceeding was not terminated in his favor *on the merits*. Rather, he was granted a reprieve by the WCPO through a process that did not involve a factfinder or finding of actual innocence.

Finally, Howard faces an additional hurdle with Michigan's version of a malicious prosecution claim. He has made no contention – and there is no evidence for it – that Defendants acted with malice. Indeed, Howard admitted during his deposition that he did not know any of these Defendants prior to July 1994 and "didn't believe" that Defendants' investigation of and recommended charges against him "was a personal thing," and instead, merely stemmed from what he perceives to be "bias toward the [nick]name" – Snoop Dog – and a rush to close the case. **Exhibit B**, pp. 189-190.

For these reasons, Howard's federal and state malicious prosecution claims fail and should be dismissed.

### D. Plaintiff Has No Viable *Brady* Violation Claim.

To establish a claim for a *Brady* violation, Howard must prove that Defendants "withheld favorable exculpatory or impeachment evidence; the state suppressed that evidence; and the suppression resulted in prejudice, meaning that the suppressed evidence was material." *LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016) citing *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir.2010). For withheld evidence to be considered material, there must be a reasonable probability that the evidence would have changed the outcome of trial, had the jury heard it. *Jamison v. Collins*, 291 F.3d380 (6th Cir. 2002), citing *Strickler v. Green*, 527 U.S. 263 (1999).

"Whether a *Brady* violation occurred is a mixed question of law and fact.*"* *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010).

Count I of Howard's Amended Complaint alleges a *Brady* violation by Defendants Harvel, Collins, Myles and Rice. The four Defendants are alleged to have used Joe Twilley as a listening post and to have extracted coerced confessions from Plaintiff and McMullen without disclosing same to the prosecutors and, in turn, defense counsel. At Count II of his Amended Complaint, Howard levels a second *Brady* claim against Defendant Childs for allegedly manufacturing the confession and coercing Howard into same by falsely promising that he could go home after signing it. Howard cannot maintain a *Brady* claim under either premise.

### 1. Howard Cannot Maintain A *Brady* Claim Premised On Defendants' Alleged Use Of Jailhouse "Snitches."

The use of jailhouse informants implicates the Fifth Amendment right regarding self-incrimination and the Sixth Amendment right to counsel. Howard claims "[t]hat the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions." Exhibit A, ¶66. Because Howard has not alleged that jailhouse informants induced any confession by *him*, he has no Fifth Amendment *Brady* claim. In *Wilson v. Burton*, 2018 WL 6977608, at *16 (W.D. Mich. Oct. 9, 2018), the court held that:

> The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." But, here, Petitioner was not compelled to speak to the jailhouse "snitches." The lack of compulsion is fatal to his claim. *Id*. citing *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty*., 542 U.S. 177, 189 (2004).

Similarly, Howard has not alleged in this case that the jailhouse informants compelled or induced his testimony. This absence of compulsion is "fatal" to his claim of a *Brady* violation if predicated on the Fifth Amendment.

Nor does Howard maintain (or even allege) a Sixth Amendment *Brady* claim which only comes into play if a jailhouse "snitch" deliberately elicits information from an indicted criminal defendant. "It violates the Sixth Amendment to use against a criminal defendant at trial evidence of his own incriminating words, which federal agents *had deliberately elicited from him after he had been indicted and in the*

*absence of his counsel.*" *Wilson* at \*17 citing *Massiah v. United States*, 377 U.S. 201, 202-03 (1964). The converse is true here. Twilley is only accused of having served as a "listening post," but there is no allegation that he actively sought to engage Howard in conversation to extract information from *him*.

Further, even if Howard could prove that Twilley was afforded special benefits in exchange for his testimony in Howard's case (which Defendants deny) and Defendants failed to disclose same, Howard cannot demonstrate that there is a reasonable probability that such evidence, had it been disclosed and heard by the jury, would have affected the outcome of the verdict. As this Court previously ruled in denying Howard's habeas petition raising a *Brady* claim premised on the very same theory:

> …Twilley may have minimized the extent of his police cooperation and/or lied about the benefits that he received from such cooperation when he testified at trial. While such information, if admissible, would have served as impeachment material, it would not have affected the outcome of trial. As noted, Twilley's credibility was contested at trial. More importantly, given the admission of petitioner's police statement in which he confessed to participating in the crimes with the co-defendants and given the other evidence linking his co-defendants to the crimes, there is no reasonable likelihood that the alleged false testimony would have affected the judgment of the jury. [**Exhibit KK** (emphasis added.)]

## 2. Howard Cannot Maintain A *Brady* Claim Premised On Howard's Allegedly Manufactured And Coerced Confession.

Howard also cannot maintain his second *Brady* theory – i.e., that Defendants failed to disclose that Howard's confession was manufactured and coerced. **Exhibit**

**A**, Count II. *Brady* is only implicated in scenarios where a criminal defendant is not in possession of information which the government has. *U.S. v. Mullins*, 22 F.3d 1365 (6th Cir. 1994). But where the criminal defendant knew or should have known the material facts permitting him to take advantage of any exculpatory fact, there is no *Brady* violation. *U.S. v. Clark*, 928 F.2d 733 (6th Cir. 1991).

Here, both Howard and Defendant Childs testified at trial (and the pre-trial *Walker* hearing) regarding the circumstances surrounding Child's interview of Howard and the confession statement he ultimately signed. Where it is undisputed that an interview and conversation occurred between Howard and Childs, Howard was obviously a party to same and knew whether anything Childs said about the interview during her trial testimony was true or false, including Childs' testimony that Howard confessed to the murders, signed a statement of his own making, and that he did so absent any threats or illusory promises. Accordingly, any alleged false testimony by Childs cannot serve as a basis for a *Brady* claim.

### E. Howard Has No Viable Self-Incrimination Claim.

Howard claims a Fifth Amendment, self-incrimination violation, claiming that his confession was coerced. A Fifth Amendment occurs if an interrogation technique is used which is so offensive to a civilized criminal justice system that it must be condemned. *Smith v. Patterson*, 430 Fed. App'x 438, 442 (6th Cir. 2011) citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Specifically, a confession is

coerced and rendered involuntary if "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *U.S. v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016).

Howard alleges that he was kept awake for 24 hours, that he was interrogated for approximately 10 hours, and that he was "functionally illiterate" when he signed the confession statement. **Exhibit A**, ¶ 24. When considering voluntariness of a confession courts evaluate 'the totality of the circumstances' to determine whether 'a defendant's will was overborne in a particular case.'" *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007). "Relevant factors include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured." *Id*. citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

The factors required for Howard to claim coercion are not met in this case. At 18 years-old, he was at the cusp of adulthood. He admits that he was advised of his rights during each interview with police. He suffered no punishment. A 10-hour interrogation is not in and of itself coercive.  See *Ledbetter v. Edwards*, 35 F.3d 1062, 1068 (6th Cir. 1994)(approving an interrogation from 11:30 a.m. to 6:00 a.m.); *Brown v. Jackson*, 501 Fed. Appx. 376, 379 (6th Cir. 2012)(concluding that a 51 hour detention was not coercive).

Howard's claim that he was "functionally illiterate" at the time is necessarily at odds with the notion that he was coerced into signing a confession. If he was forced to sign the confession against his will, then Howard knew what he was signing, and the implications of doing so. If he signed because he was illiterate, then he had no knowledge of the import of the statement he was signing and was doing so out of ignorance. The two contentions are contradictory and cannot both be true at the same time. Moreover, Howard's claim of illiteracy is also at variance with his contention that he signed the statement without reading it. A claim that he could not understand the statement he was signing cannot be reconciled with a claim that he simply refused to read the statement. Howard's contention of illiteracy is also contracted by representations made by both Howard and his defense counsel at the pre-trial *Walker* hearing. **Exhibit** F, pp. 13, 16-19, 39. Notwithstanding, a person with a learning disability and below-average reading can still voluntarily confess in a written statement. See, e.g., *Hubbard v. Bell*, 2009 W.L. 2905949 (E.D. Mich., September 8, 2009); *People v. Hubbard*, 2007 W.L. 601603, at *12 (Mich. Ct. App., February 27, 2007).

Howard claims that Defendant Myles used profanity and yelled at him but that is not coercive. See, e.g., *United States v. Twiddy*, 2007 W.L. 3256649, at *7 (D. Colo., November 2, 2007); *United States v. Ohayon*, 2012 W.L. 13070065, at *14 (D. N.M., September 19, 2012); *United States v. Flowers*, 2005 W.L. 1799195, at

*2 (D. Kan., June 17, 2005); *Dowell v. Lincoln Co, Mo*, 762 F.3d 770, 776 (8th Cir. 2014).

Coercion means "[t]o compel by force or threat <coerce a confession>." *Coerce*, Black's Law Dictionary (11th ed. 2019). According to Howard, he was told by Defendant Childs that if he signed the confession statement, he would be able to leave with his mother. Even if that promise transpired – which Defendants dispute – it was not a threat and does not automatically render his confession involuntary. In *Holland v. Rivard*, 9 F. Supp. 3d 773, 787 (E.D. Mich. 2014), aff'd, 800 F.3d 224 (6th Cir. 2015), Defendant claimed that his confession was involuntary because it was extracted through a promise that his mother and fiancée would be allowed to pay him a visit afterwards. The court disagreed. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *U.S. v. Nopphadon Ninaswat*, No. 22-20630, 2023 WL 3600753, at *12 (E.D. Mich. May 23, 2023) citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985). See also, *United States v. Campas*, 2014 WL 3887881, at *7, 10 (D. Ariz., August 7, 2014) (denying a motion to suppress where the officer promised that the interrogee could go home if he cooperated).

For these reasons, Howard's Fifth Amendment, self-incrimination violation must be dismissed.

### F.  Howard Has No Viable Fabrication Of Evidence Claim.

Howard, in his First Amended Complaint (**Exhibit A**), additionally asserts that Defendants fabricated evidence against him in violation of his Fourth and Fourteenth Amendment rights. To establish a fabrication of evidence claim, Howard needs to prove that: (1) evidence was knowingly fabricated and (2) that a reasonable likelihood exists that the evidence affected the jury's decision. *Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015).

Specifically, at Count IV, Howard claims that Defendant Childs fabricated his confession. Then, at Count VI, Howard alleges that Defendants Havel, Collins, Myles and Rice utilized fabricated confessions of McMullen and Salisbury (which implicated Howard) to jailhouse informant, Joe Twilley. Howard's fabrication of evidence claim fails on both theories.

    1.   **Howard Cannot Maintain A Fabrication Of Evidence Claim Premised On His Allegedly Manufactured Confession Statement.**

As an initial matter, any assertion by Howard that the confession statement he signed was not his - i.e., fabricated by Defendant Childs - is directly rebutted by Howard's own post-conviction statements, wherein he acknowledges that he gave Defendant Childs a statement after purportedly being show McMullen's statement implicating Howard in the shootings, and further that he lied at trial when he testified that the statement was not his. See **Exhibit B**, pp. 79-80; **Exhibit QQ**; **Exhibit RR**. Moreover, it bears repeating that the statement, as typed out by Defendant Childs,

was signed by Howard after being afforded an opportunity to review and make edits to same. See *Smith v. Patterson*, 430 Fed. App'x 438, 443 (6th Cir. 2011)(the criminal defendant "signed a written confession to the crime, making it strange to think that [the police officer] could be responsible for any falsity of statements contained in the confession."). Howard's fabrication of evidence claim against Childs must be dismissed.

> **2. Howard Cannot Maintain A Fabrication Of Evidence Claim Premised On The Allegedly Manufactured Confessions Of McMullen And Salisbury To Fellow Inmate, Joe Twilley.**

Howard's fabrication of evidence claim against Defendants Harvel, Collins, Myles and Rice likewise fails. First, Howard cannot prove that Joe Twilley's testimony regarding the confessions of McMullen and Salisbury implicating "Snoop Dog" in the crimes was indeed false. Howard was not privy to any communications between his co-defendants and Twilley. Further, as previously noted, Twilley has not been deposed or otherwise provided any other affirmation that his testimony proffered in the underlying criminal proceedings was untrue. And even if Howard could prove that Twilley's testimony at trial was in fact false, Howard, absent pure speculation and conjecture, has no admissible proofs that Defendants knew of its falsity or had any part in its fabrication. For these reasons, Howard cannot sustain a fabrication of evidence claim against Defendants Harvel, Collins, Myles and Rice.

**G. Plaintiff Has No Viable 42 U.S.C § 1988 Claim.**

Civil rights claims are brought under 42 U.S.C § 1983. While Howard vaguely identifies 42 U.S.C § 1988 as being a source of his claims in his Amended Complaint (**Exhibit A**), he does not clarify how the statute is implicated in his case. As was held by a sister court out of the Sixth Circuit:

> Next, Plaintiff attempts to bring a claim for a violation of Section 1988. However, Section 1988 does not create a federal cause of action for violation of civil rights. *Monell v. Dep't of Social Svs. of City of New York*, 436 U.S. 658, 701 (1978) (citing *Moor v. Cty. of Alameda*, 411 U.S. 693, 703–04 (1973)); *Hall v. Wooten*, 506 F.2d 564, 568 (6th Cir.1974) (citing *Otto v. Somers*, 332 F.2d 697, 699 (6th Cir.1964)). Accordingly, it is recommended that Plaintiff's Section 1988 claim fails to state a claim upon which relief may be granted and should be dismissed pursuant to Section 1915 against all Defendants. *Matthews v. City of Memphis*, No. 13-2195-JDT/CGC, 2014 WL 1022862, at *6 (W.D. Tenn. Mar. 14, 2014).

Because 42 U.S.C § 1988 has no bearing on this case, and Howard does not elaborate on the inclusion of the statute in his Amended Complaint, the claim is appropriately dismissed.

### H. Defendants Are Entitled To Qualified Immunity.

Finally, Defendants are entitled to qualified immunity on all of Howard's claims. When evaluating claims for qualified immunity, the Sixth Circuit Court of Appeals "considers whether there was (1) a constitutional violation, (2) of a clearly established right, and (3) whether the plaintiff has alleged facts supported by evidence showing that an official engaged in objectively unreasonable conduct." *LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016) citing *Moldowan v. City*

*of Warren*, 578 F.3d 351, 375 (6th Cir.2009). Qualified immunity applies unless the official's conduct violated such a right. *Pearson v. Callahan*, 555 U.S. 223 (2009). As demonstrated above, Howard cannot prove that any of his constitutional rights were violated, and consequently, Defendants are entitled to qualified immunity.

## V.      CONCLUSION AND RELIEF REQUESTED

**WHEREFORE**, for the foregoing reasons, Defendants pray that this Honorable Court grant their Motion for Summary Judgment, along with any other relief deemed warranted under the circumstances.

Respectfully Submitted,

**CUMMINGS, MCCLOREY, DAVIS & ACHO**

By: */s/ Shane R. Nolan*
SHANE R. NOLAN (P78008)
17436 College Parkway
Livonia, MI  48152
(734) 261-2400 / Fax: (734) 261-4510
snolan@cmda-law.com
Dated: June 9, 2023                  ***Attorneys for Defendants***

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon all parties of record on June 9, 2023.

/s/ Jessica E. Bluhm

{01815962-1 }  - 47 -